IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 14, 2015 Session

**CHRISTOPHER HUBBARD v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 10-04027      James C. Beasley, Jr., Judge**

**No. W2014-01716-CCA-R3-PC  -  Filed September 25, 2015**

The Petitioner, Christopher Hubbard, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his convictions of aggravated kidnapping and aggravated assault and resulting effective sentence of life without the possibility of parole as a repeat violent offender. On appeal, the Petitioner contends that he received the ineffective assistance of counsel because trial counsel failed to call a favorable witness to testify, that the trial court erred by ruling that the charges of especially aggravated kidnapping and aggravated assault did not violate double jeopardy principles, and that he received the ineffective assistance of counsel because trial and appellate counsel failed to raise the double jeopardy issue. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Jake R. Hayes, Memphis, Tennessee, for the appellant, Christopher Hubbard.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Alanda Dwyer, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The record reflects that in June 2010, the Shelby County Grand Jury indicted the Petitioner for especially aggravated kidnapping in which the victim suffered serious bodily injury in count one; aggravated assault causing serious bodily injury in count two; and aggravated assault causing bodily injury to another by use or display of a deadly weapon in count three. Count three was dismissed before trial.

In its direct appeal opinion, this court summarized the evidence presented at trial as follows:

> [O]n Monday, June 8, 2009, the Defendant entered the home of Tarina Moore ("the victim"), savagely attacked her, and left her locked inside her home. The victim testified that the Defendant was her ex-boyfriend whom she had dated for approximately four years. On the Saturday night before the incident, the Defendant and the victim attended a house party and returned to the victim's home together. On Sunday, the victim went to lunch with her children; however, the Defendant was not invited because the victim's children did not get along with him. The Defendant called the victim later that day and invited her to a barbeque, but she declined the invitation. The Defendant did not spend Sunday night at the victim's home.
>
> On Monday morning, June 8, 2009, the victim awoke to the Defendant inside her home. The victim testified that the house had been locked, but she acknowledged that she had previously given the Defendant a key. The Defendant told the victim that they needed to talk. The victim said that she laid in bed for another thirty minutes before getting up to speak with the Defendant. In the meantime, the Defendant paced downstairs and appeared to the victim to be upset. They began to argue, and the victim left her house to go to a neighbor's house. The victim could tell that the Defendant was angry, and she wanted to remove herself from the situation before it escalated. The Defendant had the victim's cell phone in his hand, and the victim planned to use the neighbor's phone to call for help. However, the neighbor was the Defendant's niece, and she was using her phone and would not let the victim use it.

The Defendant followed the victim into his niece's home. He pushed the victim onto a bed in a room in the back of the house. The Defendant wrapped his arm around the victim's neck and his legs around her body. He began hitting the side of her body. The Defendant was "hollering and screaming" and telling the victim to "shut up" and that nobody was going to help her. The Defendant struck the victim about her body and choked her. He then grabbed the victim by her hair and led her out of his niece's house.

The victim broke away and attempted to run back to her own house. She planned to beat the Defendant in a footrace to the door and lock him outside. As she reached her front door, the Defendant caught up to her and pushed his way into her house. He pushed her into a back room. The Defendant had left clothes at the victim's house, and he instructed her to put the clothes into a duffle bag. When she did not do so quickly enough, he punched her so hard that she fell down. The victim could hear the Defendant talking to someone on the phone and telling that person to come get him. As he was doing so, the victim again tried to escape, but the Defendant snatched her and threw her on the floor. He told her that he was going to kill her.

The victim again broke free. She ran out her back door and to another neighbor's house. She asked the neighbor to call the police, but the neighbor refused, saying that he did not "want this trouble in [his] house." The Defendant grabbed the victim, took her out of the neighbor's house, and pushed her back toward her house. He pushed her on the ground, punching and kicking her all the while. At one point, the Defendant grabbed the victim's head and slammed it against a wall. The Defendant threw the victim back into her house, where he continued to assault her. The victim said that after a final blow, she could not see anything and fell to the floor. The Defendant grabbed his duffle bag and got into a green Jeep, which someone had driven to pick him up. The victim estimated that the attack lasted between two and three hours.

The victim testified that after the Defendant left, she was locked inside her home and could not get out. She explained that she had double deadbolts on her doors, which required a key to open from either the inside or the outside. The Defendant had taken the victim's key and had also taken her cell phone, leaving her without a way to call for help. Upon cross-examination, the victim testified that the windows to her house locked from the inside. On redirect examination, the prosecutor asked the victim whether she would have been able to get out of the windows, and the victim replied that she could not have "[b]ecause the landlord had these types of locks that you can't—I can't get to them fast enough if I tried to get out of the house." The victim was then asked whether she could have gotten out of the windows once the Defendant left, and the victim replied that she had not considered doing so.

The victim's daughter, Keayasha Lee, testified that she had been unsuccessfully trying to call her mother's cell phone starting at around 11:30 a.m. She called approximately ten times and eventually went to the victim's house. Lee used her key to open the door. When she did so, she discovered her mother limping, with a black eye and a swollen face.

The victim was taken by ambulance to a hospital where she spent three or four days in the intensive care unit. Dr. James Langston, a neuroradiologist with the University of Tennessee Medical School, participated in the victim's medical diagnosis and testified at trial. According to Dr. Langston, the victim suffered a bruise to the scalp and a bruise to the face. CT scans revealed that the victim suffered bruising on the brain and blood collected between the skull and brain. Dr. Langston opined that the internal injuries were caused by the victim's brain hitting the inside of her skull. Photographs were introduced showing the extent of the victim's injuries including a split lip, an eye swollen shut, bruises on the face, arms and shoulders, scratches, bite marks, and hair missing from her scalp.

State v. Christopher Hubbard, No. W2011-01078-CCA-R3CD, 2012 WL 2196303, at *1-2 (Tenn. Crim. App. at Jackson, June 15, 2012).

- 4 -

The jury convicted the Petitioner of aggravated kidnapping, a Class B felony, as a lesser-included offense of especially aggravated kidnapping and aggravated assault, a Class C felony, as charged. In the second part of the bifurcated trial, the jury found that the Petitioner had a prior conviction of second degree murder. The trial court sentenced him as a repeat violent offender to life without parole for the aggravated kidnapping conviction and as a Range II, multiple offender to ten years for the aggravated assault conviction. The court ordered that he serve the sentences concurrently.

On direct appeal to this court, the Petitioner claimed that the evidence was insufficient to support his aggravated kidnapping conviction because the proof failed to show that he knowingly confined the victim so as to substantially interfere with her liberty, noting that he left the victim in her own home, that she was not bound or gagged, and that she could have escaped through a window. Id. at *3. This court found the evidence sufficient, stating that "[t]he jury could infer from the Defendant's actions that by locking the victim in her house and taking her keys and cell phone he confined her and substantially interfered with her liberty" and that the victim was not required to take the "drastic action" of jumping out a window in order to avoid being kidnapped. Id. at *4.

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely petition for post-conviction relief, alleging, in pertinent part, that he received the ineffective assistance of counsel. The post-conviction court appointed counsel, and counsel filed an amended petition, claiming that the State's submitting both the especially aggravated kidnapping and aggravated assault charges to the jury violated double jeopardy and that trial and appellate counsel's failure to raise the double jeopardy issue constituted the ineffective assistance of counsel. Post-conviction counsel subsequently filed a second amended petition, claiming that trial counsel also was ineffective for failing to present proof at trial that the victim's back door could have been unlocked from the inside, which contradicted the victim's trial testimony.

At the evidentiary hearing, trial counsel testified for the Petitioner that he had been practicing criminal law for twenty-two years and worked for the public defender's office. He said that he and the Petitioner "had a little bit of trouble communicating," that the facts of the case were "pretty bad," and that he tried to show the jury that the victim "had a point of egress" out of her home. Trial counsel stated that there were "two facets where the jury could find kidnapping." First, the Petitioner confined the victim to her house. Second, "when she ran out of the house and she was dragged back in." Trial counsel did not file a motion for a bill of particulars regarding the kidnapping charge. He also did not hire an investigator and did not himself investigate the locks on the doors and windows of the home. He and the Petitioner talked about the windows being unlocked but did not discuss how the doors were locked. The Petitioner told trial counsel that he had lived in

- 5 -

the home, and trial counsel did not contact the owner of the property. Trial counsel said that he researched "the merging or the due process issues" and considered two cases, "Richardson" and "Dickson." However, he did not make a due process argument.

On cross-examination, trial counsel testified that he had handled about seventy-five jury trials during his twenty-two-year career. He said he went over the discovery materials with the Petitioner "[a]s best as [he] could."

Appellate counsel testified for the Petitioner that he began practicing law in 1990 and worked for the public defender's office. The testimony at trial was that the locks on the victim's doors were "double dead bolt locks, meaning you needed a key from either side to unlock the door, inside or outside." Counsel said that on direct appeal of the Petitioner's convictions, counsel "tried to make the kidnapping about whether [the victim] was confined in her own home" and that he did not remember the State's making any argument "that she in fact was kidnapped prior to that." Counsel focused on whether the Petitioner intended to confine the victim in her house. This court addressed that issue and found the evidence sufficient. Counsel stated that the jury convicted the Petitioner of aggravated kidnapping, not especially aggravated kidnapping, "so that's what we deal with on appeal." Counsel said that aggravated assault was not a lesser-included offense of aggravated kidnapping; therefore, he did not address a double jeopardy issue on appeal. He said that he also did not think aggravated assault was a lesser-included offense of especially aggravated kidnapping. Therefore, he also did not address that issue on appeal.

Susan Jones testified for the Petitioner that her son owned a home on Rachel Road in Memphis, that she and her husband managed the property, and that the victim was living in the home in June 2009. Jones said she was familiar with the locking mechanisms on the doors and windows "at the current time." She explained that the home had two front exterior doors: an outer security door with a "double lock" and an inner wooden door without a double lock. For the outer security door, a person had to have a key to unlock the door. The home's rear exterior door also consisted of an outer security door and an inner wooden door. Jones stated that the rear security door "is not double locked and has full access to anybody who wants to come in or out of the house." The inner wooden door also was not double locked.

Post-conviction counsel asked if the locks on the doors were any different in 2009, and Jones stated that she had "done some research and looked at our records." According to the records, the house had "considerable" damage. Jones said that a damage report "indicated that we replaced one security door." However, a ledger sheet for actual repairs done on the home did not show that a security door was replaced. Jones said she also had no memory of replacing a security door. She then explained as follows:

> [R]eplacing a security door is a fairly major activity and not inexpensive. So I would say that our ledger sheet reflects accurate information. We would in doing a damage report, we would err on the side of being financially as careful as possible in terms of security doors in particular. If we thought that there was damage to a security door and we didn't know whether we could repair it or not, then that damage we would have listed that as possibly one that would have to be repaired.
>
> . . . .
>
> The list itself of repairs indicates that we did not do it. I checked with our principal repair person at that time. He has no recollection of actually replacing. We would not replace a door. You purchase the door. They come and size it. They come and replace it. There is no indication of a replaced door.

Jones acknowledged that she was not "100 percent" positive that the rear security door did not have a double lock in June 2009. However, nothing indicated that the door had been changed since that time. Trial or appellate counsel never contacted the Joneses about the locks on the doors.

On cross-examination, Jones testified that she had no personal knowledge about the locks on June 8, 2009. She acknowledged that according to her records, one of the security doors was damaged. She stated, "How substantial I don't know, but I would think possibly substantial enough that we would have listed it . . . as replaceable." She also stated that "I cannot say that it was the back door that we even listed as necessary to replace. It could have been the front door or the back door." Upon being questioned by the post-conviction court, Jones clarified that "we listed initially . . . as one of the two doors would be replaced and one would be repaired. . . . [B]ut obviously I have no reason to question our ledger because we have no reason to adulterate that ledger. And as a consequence, there's no record of replacing the doors."

On redirect examination, post-conviction counsel asked Jones if her records would have been more accurate or she would have had "better information" about the replacement of the doors if she had been called to testify at trial in 2010. Jones said that her memory would have been better then but that "[t]hat's all that I could say on that."

The Petitioner testified that the State initially charged him with aggravated assault and that the especially aggravated kidnapping charge "came later." Trial counsel met with him "a few times, three times at the most" after the State charged him with aggravated assault and "like two times" after the State charged him with especially aggravated kidnapping. The Petitioner said that he and counsel "couldn't come to an understanding" and that counsel never asked him about the locks on the doors or if the Petitioner could have locked the victim inside her own home. The Petitioner said that he told trial counsel to take photographs of the locks but that counsel "didn't do nothing." Upon being questioned by the post-conviction court, the Petitioner said that he did not take the victim's keys and that he had no reason to take the keys because he lived in the home and had his own keys.

Regarding the Petitioner's double jeopardy issues, post-conviction counsel argued that "especially aggravated kidnapping is simply false imprisonment with aggravated assault also occurring. That is what my argument is based on." The post-conviction court did not address whether the indicted offenses of especially aggravated kidnapping and aggravated assault violated double jeopardy, instead concluding that the Petitioner was not entitled to relief because the convicted offenses of aggravated kidnapping and aggravated assault were "two separate crimes." The court stated that the "proof is clear" that the victim suffered serious bodily injury while she was confined and, therefore, that "I don't think there's a double jeopardy issue." The trial court noted that with regard to the aggravated assault, the victim was beaten "for an extended period of time, resulting . . . in some hospitalization and ICU and bleeding on the brain and there was some serious head trauma." Regarding the aggravated kidnapping, the post-conviction court recalled that the Petitioner detained the victim, imprisoned her, moved her more than once, and then confined her inside the house.

As to trial counsel's failure to have someone testify about the locks at trial, the post-conviction court noted that the victim

> was clearly questioned about the fact that she was locked in, the doors were locked, she didn't have a key to open those locks, that she didn't have a cell phone to call the police, that she remained inside the house until her daughter came and found her there and the daughter testified she had to open the door to get inside to call the police and seek treatment.

The court found Jones's testimony "informative." However, the court noted that Jones was not able to say "definitively one way or the other with regard to these doors that they were dead bolted and locked" and stated that "I don't actually know and she can't tell me what she would have said four years ago or five years ago." Thus, the court did not find

counsel deficient for failing to call Jones as a witness at trial and denied the petition for post-conviction relief.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Generally, [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component. Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

## A. Defense Witness

First, the Petitioner contends that he received the ineffective assistance of counsel because trial counsel failed to call Jones as a defense witness. He claims that if trial counsel had presented Jones's testimony, the jury "almost assuredly" would not have convicted him of aggravated kidnapping because the jury "received absolutely no indication that the back door might not have been double locked." In other words, he contends that the jury would not have found that he falsely imprisoned the victim. The Petitioner also contends that the post-conviction court did not properly consider whether he was prejudiced by counsel's failure to call Jones as a witness because, by requiring that Jones state definitively that the back door was not double-locked at the time of the crime, the court held the Petitioner to a much higher standard than the standard of whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." The State argues that the Petitioner is not entitled to relief. We agree with the State.

In the Petitioner's direct appeal of his convictions, the Petitioner and this court only addressed the evidence regarding the Petitioner's leaving the victim locked inside her house and whether that evidence was sufficient to support the Petitioner's conviction of aggravated kidnapping. However, our review of the direct appeal record reveals that the State did not make, and that the Petitioner did not request, a formal election of offenses at the close of the State's case-in-chief.[1] In any event, the State is not required to make an election of offenses when the crime at issue is considered a single, continuous course of conduct. State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000). At the Petitioner's sentencing hearing, defense counsel advised the trial court that the Petitioner's convictions apparently were based on "one complete incident." Thus, even if Jones had testified definitively at trial that the outer security door did not have a double-lock, the remaining evidence would have been more than sufficient for the jury to have found that the Petitioner falsely imprisoned the victim. The Petitioner held the victim captive for a significant amount of time before he ever left the residence, locking her inside. Therefore, we agree with the post-conviction court's conclusion that the Petitioner was not prejudiced by counsel's failure to call Jones as a witness at trial.

## B. Double Jeopardy

---

[1] The direct appeal record fails to include the closing arguments in which the prosecutor's closing argument may have effectively served as an election of offenses. See State v. Anthony Allen, No. W2004-01085-CCA-R3-CD, 2005 WL 1606350, at *14 (Tenn. Crim. App. at Jackson, July 8, 2005); see also State v. Courtney Knowles, ___ S.W.3d ___, No. W2013-00503-SC-R11-CD, 2015 WL 4717708, at *9 (Tenn., July 31, 2015) (recently noting that "several different panels of the Court of Criminal Appeals have held that a failure to instruct the jury properly about the State's election of offenses may be cured by a prosecutor's closing argument if it provides an effective substitute for the missing instructions").

Next, the Petitioner contends that the post-conviction court erred by refusing to find that his double jeopardy protections were violated when the jury was allowed to consider the charges for both especially aggravated kidnapping in which the victim suffered serious bodily injury and aggravated assault resulting in serious bodily injury because "[t]here was only one infliction of bodily injury, and the State indicted and tried Mr. Hubbard for it twice." In a related argument, he contends that trial and appellate counsel were ineffective for failing to raise the double jeopardy issue. Again, we conclude that the Petitioner is not entitled to relief.

Initially, we note that the State claims that the Petitioner has waived his contention that the jury's being allowed to consider the charges of especially aggravated kidnapping and aggravated assault violated double jeopardy principles because he "failed to raise it in the proceedings below." The Petitioner raised the issue in his first amended petition for post-conviction relief. However, he failed to raise it at trial or on direct appeal of his convictions. This court has previously held that raising a double jeopardy claim in a post-conviction action when the petitioner "fail[ed] to present such a claim for determination in any proceeding before a court of competent jurisdiction in which the claim could have been presented waives the claim for post-conviction purposes." Sean Earl Jones v. State, No. M2006–00664–CCA–R3–PC, 2007 WL 1174899, at *7 (Tenn. Crim. App. at Nashville, Apr. 20, 2007), perm. to appeal denied, (Tenn. 2007); see also Tenn. Code Ann. § 40-30-106(g) (stating that generally "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented"). Nevertheless, the Petitioner also alleges that he received the ineffective assistance of counsel because trial and appellate counsel failed to raise the issue. Because we cannot address the ineffective assistance of counsel claim without first analyzing whether his being indicted for especially aggravated kidnapping and aggravated assault violated double jeopardy, we will consider the double jeopardy issue.

The United States and the Tennessee Constitutions require that an indictment inform the accused of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. An indictment satisfies this constitutional requirement "if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). The validity of an indictment is a question of law that we usually review de novo. Id.

The Petitioner contends that the indictment violates double jeopardy principles because the indicted offense of especially aggravated kidnapping "appears to encompass"

the indicted offense of aggravated assault. In <u>State v. Watkins</u>, 362 S.W.3d 530, 556-57 (Tenn. 2012), our supreme court opted to rely upon a two-step test based upon <u>Blockburger v. United States</u>, 284 U.S. 299, 304 (1932), to determine when double jeopardy attached. Our supreme court stated that courts must "first consider whether the defendant's dual convictions arose from the same act or transaction." <u>Watkins</u>, 362 S.W.3d at 558. The second step of the test "requires courts to examine the statutory elements of the offenses." <u>Id.</u> at 557. Generally,

> [i]f the elements of the offenses are the same, or one offense is a lesser included of the other, then we will presume that multiple convictions are not intended by the General Assembly and that multiple convictions violate double jeopardy. However, if each offense includes an element that the other does not, the statutes do not define the "same offense" for double jeopardy purposes, and we will presume that the Legislature intended to permit multiple punishments.

<u>Id.</u> (footnote omitted). Recently, our supreme court concluded that the retroactive application of <u>Watkins</u> does not offend due process. <u>State v. Terrence Justin Feaster</u>, ___ S.W.3d ___, No. E2012-02636-SC-R11-CD, 2015 WL 3952695, at *5 (Tenn., June 25, 2015).

Turning to the instant case, there is no evidence that our legislature intended to prohibit multiple punishments in circumstances such as those in this case. Next, the State concedes, and we agree, that the first prong of the <u>Blockburger</u> test has been met in that the charges, which resulted in the Petitioner's convictions of aggravated kidnapping and aggravated assault, resulted from the same transaction. Therefore, we turn to the second prong of the <u>Blockburger</u> test and determine whether the charged offenses constitute the same crime.

As charged in the indictment, especially aggravated kidnapping is defined as "knowingly remov[ing] or confin[ing] another unlawfully so as to interfere substantially with the other's liberty . . . where the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-302(a), -305(a)(4). At the time of the crimes, a person committed aggravated assault who intentionally or knowingly committed an assault that "[c]aused serious bodily injury to another." Tenn. Code Ann. § 39-13-102(a)(1)(A) (2006).[2] Assault occurs when a person intentionally, knowingly, or recklessly causes bodily injury to another. Tenn. Code Ann. § 39-13-101(a)(1). As this court has stated,

---

[2] In 2011, Tennessee Code Annotated section 39-13-102(a)(1)(A) was amended to provide that a person committed aggravated assault who knowingly committed an assault that "[r]esulted in serious bodily injury to another."

These two statutory offenses contain separate and distinct elements. The kidnapping offense, as relevant to this case, involves false imprisonment where the victim <u>suffers</u> serious bodily injury. Conversely, the assault offense requires that the perpetrator of the assault <u>cause</u> the serious bodily injury. This makes the statutory elements of the offenses dissimilar.

<u>State v. Chester Dale Gibson</u>, No. M2005-01422-CCA-R3-CD, 2006 WL 770460, at *13 (Tenn. Crim. App. at Nashville, Aug. 28, 2006), <u>perm. to appeal denied</u>, (Tenn. 2006). Given that the elements of the two indicted offenses were different, they were two separate crimes. Accordingly, the convictions also do not violate double jeopardy, and trial and appellate counsel were not ineffective for failing to raise the issue below.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE

- 13 -